## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 13-85** |
| **v.** | * | **SECTION: "G"** |
| **MELVIN JAMES** | * | |

\* \* \*

### UNITED STATES' REPONSE IN OPPOSITION TO DEFENDANT'S
### THIRD EMERGENCY MOTION FOR COMPASSIONATE RELEASE

The United States of America, through the undersigned Assistant United States Attorney,
asks that the Court deny the defendant's third motion for compassionate release based on concerns
arising from the COVID-19 pandemic, which is at Rec. Doc. 104.

### RELEVANT BACKGROUND

In late 2012, the defendant was arrested in the possession of approximately 10 grams of
heroin that he was attempting to distribute to a confidential source at a gas station in Slidell. PSR
¶ 12. A subsequent search at the defendant's residence in New Orleans yielded another almost
100 grams of heroin and four guns, including a .44 caliber rifle, a .38 caliber revolver, which was
stolen, a .380 caliber pistol, and a .45 caliber pistol. PSR ¶¶ 13-14. Police also seized prescription
pills, cutting agents, digital scales, baggies and other materials used for packaging and distributing
narcotics, and $3,189 in cash. PSR ¶ 15.

In April 2013, a federal grand jury in this District returned a three-count indictment
charging James with possession with intent to distribute heroin, being a felon in possession of a
firearm, and possession of a firearm in furtherance of a drug trafficking offense. PSR ¶¶ 1-3. In
February 2014, James pleaded guilty to the possession with intent to distribute heroin and felon in
possession of a firearm charges. PSR ¶ 5. In exchange, the government agreed to move to dismiss
the possession of a firearm in furtherance of drug trafficking charge, which carried a mandatory

minimum five year to life sentence that by statute had to run consecutive to any other term of imprisonment.  PSR ¶ 6; 18 U.S.C. § 924(c).

Because of his significant criminal history, James qualified as both a career offender and an armed career criminal, which increased his offense level from 32 to 34.  PSR ¶¶ 32-33.  The prior convictions included a federal conviction for conspiracy to distribute cocaine from a 1994 case when James was 26 for which he received 100 months, which was later reduced to 50 months. PSR ¶ 37.  The PSR notes significant disruptive conduct while serving that sentence, as well as a poor adjustment to supervised release, with it being revoked and James ordered to serve an additional 37 months.  *Id*.  At age 32 and while on supervised release for the prior federal conviction, James pleaded guilty to distributing heroin and possessing crack with the intent to distribute in a federal case in this District.  PSR ¶ 38.  He was sentenced to 75 months and three years of supervised release, which ended in 2011.  In 2012, James picked up another drug charge for possession of heroin, to which he pleaded guilty in Orleans Parish in 2014 and received a four-year sentence.  PSR ¶ 33.  Finally, in 2013, James was tried and convicted in St. Tammany Parish for possession of heroin with the intent to distribute for the conduct at the gas station in Slidell mentioned above, and sentenced to 20 years without parole.  PSR ¶ 40.  James does not mention this state sentence in his pleading nor explain how the granting of compassionate release on the federal sentence would result in his actual release given the lengthy state sentence.

In this case, James was sentenced to 198 months, which was in the middle of the recommended guideline range of 188 to 235 months.  PSR ¶ 81.  The Court ordered that all but three years of the sentence run concurrently with his 20-year state sentence.  The Court later reduced James' sentence to 150 months as to Count One and 120 months as to Count Two—with the two terms to be served concurrently.  Rec. Doc. 88.  James has been serving his sentence at

FCI Oakdale.  Per the Bureau of Prison's online inmate lookup tool, James has a release date of September 24, 2025.  *See* https://www.bop.gov/inmateloc/.

James originally moved for compassionate release in April 2020.  In the original motion, James, who is 52, alleged that he had hypertension and diabetes, and contended that the Court should grant him a sentence reduction under Section 3582 (c)(1)(A)(i) due to the spread of COVID-19 at FCI Oakdale, the correctional facility where he is incarcerated.  Rec. Doc. 90.  The government opposed James' motion.  Rec. Doc. 94.  The Court issued a detailed order summarizing the parties' positions and the law applicable to compassionate release, and ultimately denied James' motion on the basis that he failed to exhaust administrative remedies within the BOP before pursuing relief in federal court.  Rec. Doc. 95.

On July 14, 2020, James filed a second motion for compassionate release.  Rec. Doc. 96.  With respect to the exhaustion issue, James added that on April 17, 2020, he made a "formal request" to Warden Rodney Meyers for relief pursuant to the CARES Act.  Rec. Doc. 96 at 5.  James did not attach a copy of this "formal request" to his pleading, and the Court denied without prejudice the second motion to dismiss for failure to exhaust.  Rec. Doc. 101.

On November 1, 2020, James filed a third motion for compassionate release.  Rec. Doc. 104.  James attached as an exhibit what purports to be a September 22, 2020 communication to the warden at Oakdale requesting that the warden file a motion for compassionate release on James' behalf.  Rec. Doc. 104-1 at 2.  Since 30 days have passed since September 22, 2020, James maintains that he has exhausted his administrative remedies.  Rec. Doc. 104 at 3.  With respect to the merits, James asserts that his medical conditions put him at high risk of a severe case were he to contract COVID and that the risk he faces constitutes an extraordinary and compelling reason

for him to be release.  *Id*. at 3-4.  James also asserts that he is not a danger to the community and details a plan for where he would live if the Court released him.  *Id*. at 4.

## ARGUMENT

In the interest of brevity, the government incorporates by reference rather than repeating the arguments set forth in its opposition to James' initial motion for compassionate relief and its opposition to James' second motion for compassionate relief.  *See* Rec. Docs. 94 and 98.  The Court's thorough opinions denying those motions detailed both parties' arguments and the law applicable in deciding these types of motions, particularly as it relates to exhaustion.  Because James essentially re-urges the same motion now that he has purportedly made a written request to the warden—and thus exhausted administrative remedies—most of the arguments in the original motions and responses in opposition still apply.

As to the exhaustion question, although the "to" line of the document that James attached to his pleading is blank, the government acknowledges that James has made a written request to the warden for relief and concedes that James has exhausted his administrative remedies.  Despite exhausting his administrative remedies, however, James has failed to demonstrate that he meets the requirements for compassionate release on the merits.  The BOP generally, and the Oakdale facility in particular, have instituted measures that have largely controlled the virus.  There are five inmates and fifteen staff members with positive COVID results at FCI Oakdale 1, where James is incarcerated at this time.  James' medical records show that he has been noncompliant with the diabetes treatment he is receiving at BOP, which presumably increases his risk through no fault of the government or the BOP.  *See* Rec. Doc. 98, Attachment 2 (filed under seal) at 15 (noting that James stated his chocolate consumption was elevating his blood sugar), 41 (noting James reported he has been eating badly since Thanksgiving and not exercising).  James has been tested for

COVID multiple times, including negative tests in May, June, and July 2020.  *Id*. at 1, 12, 19, 72, 77, 83.  James has an extensive criminal history including three federal felony convictions, which qualify him as a career criminal and an armed career criminal, as well as several state convictions, one of which he currently has a term of 20 years imprisonment without the benefit of parole, which means his release plans would likely involve a transfer to state custody rather than the plans he details in his motion.  Several of these convictions involved criminal conduct while on supervised release and/or state parole, which cuts against his argument that he will not be a danger if released. For these reasons, his motion should be denied on the merits.

I.      **James Fails to Acknowledge the BOP's Response to the COVID-19 Pandemic**

In response to the COVID-19 pandemic, BOP has taken significant measures aimed at inmate safety and, when appropriate, release to home confinement. As the Attorney General's April 3, 2020, memorandum reflects, BOP is modifying its response to the virus on a daily—even hourly—basis and prioritizing the release of at-risk prisoners to home confinement.[1] Indeed, BOP has been planning for potential COVID-19 transmissions since January, establishing a working group to develop policies in consultation with experts in the Centers for Disease Control, the World Health Organization, and others.[2] BOP then developed a COVID-19 action plan that it has continued to revise and update in response to the fluid nature of the COVID-19 pandemic and in response to the latest expert guidance. The plan comprises many preventive and mitigation measures, including screening all incoming inmates; regularly screening staff; limiting contractor

---

[1] *See* https://www.justice.gov/file/1266661/download.

[2] Since 2012, BOP has had a Pandemic Influenza Plan in place. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

visits to essential services; suspending nearly all attorney, social, and volunteer visits; limiting inmate movement between facilities; and taking additional steps to modify operations to maximize social distancing.

As updated, the current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells to reduce any spread of the disease.[3]  BOP states that only limited group gatherings are permitted and then with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. With exceptions for medical treatment and similar exigencies, this step also is intended to limit transmission of the disease.  Likewise, all official staff travel has been cancelled, as has most staff training. BOP advises that staff and inmates have been issued cloth face masks to use when social distancing cannot be achieved.[4]

Further, BOP states that every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms.[5]  Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff.  Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.[6]  In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. BOP reports that staff registering a temperature of

---

[3] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
[4] *See*
https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.
[5] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
[6] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone, and others with less serious symptoms can be placed on leave by medical staff.[7]

In addition, contractor access to BOP facilities has been restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.[8] BOP reports that all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access is screened for symptoms and risk factors. Social and legal visits are suspended to limit the number of people entering the facility and interacting with inmates. To help ensure that family relationships are maintained throughout its modified operations, BOP has increased detainees' telephone allowance to 500 minutes per month. Under the plan, legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at its regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Also, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.[9] That authority includes the ability to place an inmate in home confinement during

---

[7] *See* https://www.bop.gov/coronavirus/docs/covid19_staff_screening_tool_v2.8_20200327.pdf.
[8] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
[9] *See* https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf.

the last six months or 10 percent of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).[10] On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.[11] As of this filing, BOP has transferred 16,693 inmates to home confinement since the Attorney General's March 26 directive.[12]

Taken together, BOP advises that all these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution and that it will initiate additional measures as appropriate. As of this filing, BOP reports that 2,092 inmates and 899 staff have confirmed positive test results for COVID-19 nationwide, with 134 inmate deaths and 2 staff deaths, out of about 152,000 inmates and 36,000 staff nationwide. At FCI Oakdale 1, BOP reports that 5 inmates and 15 staff have confirmed positive test results for COVID-19, with 7 inmate deaths and 0 staff deaths and with 221 inmate recoveries and 21 staff recoveries.[13]

---

10 This gives BOP the authority to set an inmate's term of home confinement without the statutory limitation to only the last six months or 10 percent of his sentence.

[11] *See* https://www.justice.gov/file/1266661/download.

[12] *See* https://www.bop.gov/coronavirus/index.jsp.

[13] *See* https://www.bop.gov/coronavirus/index.jsp.

8

In addition to these considerations, BOP advises that it must continue other critical operations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public and take into account the effect of a mass release on the safety and health of both the inmate population and the community. It must allocate resources to care for inmates in the most beneficial and efficient manner possible and assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care on release. BOP also must balance many other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.      Janes Has Not Satisfied the Requirements for Compassionate Release

### A.      Legal Framework.

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment.[14]  Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. 18 U.S.C. § 3582(c)(1)(A).  A district court may grant the defendant's motion for a reduction in his sentence only if the motion is filed (1) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility,

---

[14] Section 603(b) of the First Step Act of 2018 allowed defendants for the first time to seek this relief from the Court. Previously, only the BOP could request such relief.

whichever is earlier." *Id.*[15]   "The statute's language is mandatory." *United States v. Franco*, No. 20-60473, 2020 WL 5249369, at *2 (5th Cir. Sept. 3, 2020).

If the defendant meets this exhaustion requirement, then a district court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).  The defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *see also United States v. Davis*, No. CR 07-357, 2020 WL 2838588, at *2 (E.D. La. June 1, 2020) (Africk, J.) ("The defendant bears the burden of demonstrating that he is entitled to compassionate release and that he has exhausted his administrative remedies.").

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a district court may reduce the term of imprisonment after considering the § 3553(a) factors if it finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);"

---

15 The government acknowledges that some courts have required a defendant to exhaust his administrative appeals before filing a § 3582(c)(1)(A) motion. *See, e.g.*, *United States v. Ansari*, No. CR 07-337, 2020 WL 4284340, at *4 (E.D. La. July 27, 2020) (Fallon, J.); *United States v. Ellis*, No. CR 13-286, 2020 WL 4050409, at *2 (E.D. La. July 20, 2020) (Vance, J) (collecting cases). The government, however, maintains that, under § 3582(c)(1)(A), either exhaustion of BOP administrative appellate rights or the expiration of thirty days after transmitting a request to the warden—"whichever is earlier"—is all that is required for a court to consider the motion. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (not precedential) (agreeing with government concession that "or" and "whichever is earlier" means that while inmates can satisfy the statute's thirty-day requirement by exhausting all BOP administrative remedies, they independently can satisfy the requirement by transmitting a request to the warden and waiting 30 days before filing a motion with the district court).

and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Finally, the note permits the BOP Director to identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).[16]

---

[16] The policy statement refers only to motions filed by the BOP Director. The policy statement was last amended on November 1, 2018, before enactment of the First Step Act when defendants were not allowed to file motions under § 3582(c)(1)(A). *Cf.* First Step Act § 603(b). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), the government maintains that policy statement remains binding and empowers defendants to seek relief from the Court as defined in Application Note 1(A) through (C). However, as explicitly stated in Application Note 1(D), the BOP retains sole authority to identify other reasons beyond those set forth in Application Note 1(A) through (C). The government acknowledges that not all district courts have agreed with its position.

**B.     The Court Should Deny the Motion Because Although James has Established that He has a Qualifying COVID-19 risk factor, Other Factors Weigh Strongly against his Release.**

At the present time, it is apparent that, but for the COVID-19 pandemic, James would present no basis for compassionate release.  His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution.  Indeed, it appears the biggest impediment to managing James' conditions is James' failure to comply with the treatment recommendations, his poor diet and lack of exercise, and his failure to take the prescribed medications.  The defendant, however, has met his burden of demonstrating, through reliable medical evidence in the form of medical records from the BOP, that he has a chronic condition (i.e., one "from which [the defendant] is not expected to recover"), and that his chronic condition reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.  *See* U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

The government acknowledges that the defendant presents a risk factor identified by the CDC as heightening the risk of severe injury or death were the inmate to contract COVID-19.  Specifically, the medical records show that James suffers from diabetes.  The government agrees that this chronic condition presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n.1(A)(ii), in that at this time the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.

Although the defendant has established "extraordinary and compelling reasons" for a sentence reduction, his request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community or that he merits release under the applicable § 3553(a) factors.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Here, the defendant has the burden to "demonstrate that he 'is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'" *United States v. Reed*, No. CR 15-100, 2020 WL 2850145, at *4 (E.D. La. June 2, 2020) (Fallon, J.) (quoting U.S.S.G. § 1B1.13.). "Section 3142(g) requires the court to consider factors such as the nature and circumstances of the charged offense, the history and characteristic of the defendant, and the nature of seriousness of the danger to a person or the community at large posed by the defendant's release." *Id.* (citing 18 U.S.C. § 3142(g)). The defendant has not satisfied this burden, which is a sufficient reason to deny a sentence reduction.

The defendant's criminal history, as detailed in the PSR, demonstrates that he is a danger to the community and should not be released from prison. Because of his significant criminal history, at the time of sentencing in this case, James qualified as both a career offender and an armed career criminal. PSR ¶¶ 32-33. The prior convictions included a federal conviction for conspiracy to distribute cocaine from a 1994 case when James was 26 for which he received 100 months, which was later reduced to 50 months. PSR ¶ 37. The PSR notes significant disruptive

13

conduct while serving that sentence, as well as a poor adjustment to supervised release, with it being revoked and James ordered to serve an additional 37 months.  *Id*.  At age 32 and while on supervised release for the prior federal conviction, James pleaded guilty to distributing heroin and possessing crack with the intent to distribute in a federal case in this District.  PSR ¶ 38.  He was sentenced to 75 months and three years of supervised release, which ended in 2011.  In 2012, James picked up another drug charge for possession of heroin, to which he pleaded guilty in Orleans Parish in 2014 and received a four-year sentence.  PSR ¶ 33.  Finally, in 2013, James was tried and convicted in St. Tammany Parish for possession of heroin with the intent to distribute for the conduct at the gas station in Slidell mentioned above, and sentenced to 20 years without parole.  PSR ¶ 40.[17]  Additionally, the instant offense involved drugs and guns, with James being caught with four guns, including a stolen one.  Congress, partially in recognition of the danger that flows from guns and drugs being together, criminalized the possession of weapons in furtherance of drug trafficking, which James was charged with.  Further, the Fifth Circuit has explicitly adopted the commonsense notion that the risk of continued drug trafficking while on bail constitutes a risk to the community.  *United States v. Rueben*, 974 F.2d 580, 856 (5th Cir. 1992).  Given James' lengthy history of drug trafficking conviction followed by a short release followed by another drug trafficking conviction, the risk that he will yet again trafficking drugs if released constitutes a danger to the community.

In addition, the § 3553(a) factors strongly disfavor a sentence reduction.  As noted, James' criminal history and status as a career offender and an armed career criminal weigh against release.

---

[17] As noted above, James does not mention this state sentence in his pleading nor explain how the granting of compassionate release on the federal sentence would result in his actual release given the lengthy state sentence.

Further, James would not even be out of jail if the Court granted his motion.  He still has a 20 year sentence from state court that must be served without the benefit of parole.  Thus, he would presumably just be transferred from federal custody to state custody if the Court grants his motion. That transfer increase the risk of COVID both to James and to the inmates at whatever facility he transfers to in the state prison system.  It makes little sense to release him five years early on a federal sentence because of the risk he faces from COVID in prison when his "release" will simply mean being incarcerated in a different facility, where he may or may not receive the same medical care and monthly COVID testing that he is receiving in Oakdale.  His crime was also serious in that it involved distribution of heroin and the possession of several guns, one stolen, despite James' status as a multi-time felon.  Finally, his medical condition appears to be at least partially a result of his poor dietary choices and failure to exercise.  *See* Rec. Doc. 98, Attachment 2 (filed under seal) at 15, 41.

As one district court has observed, the factors can preclude relief even for a white-collar defendant with no history of violence:

> The Court recognized the severity of Reed's criminal offenses at the time of his sentencing, but after considering the amorphous and fluid state of the jurisprudence defining unlawful action relating to holding public office, as well as Reed's age and physical infirmities, the Court concluded that a significant downward variance was warranted and reduced Reed's sentence from the guideline range of 108 to 134 months in prison down to 48 months in prison. Of the four-year prison term to which he was sentenced, Reed has served one year of it, or 25 percent. Thus, Reed was already sentenced to 60 months less than the low end of the guideline range suggested for a criminal defendant with similar offense levels and criminal histories and is now seeking to be released after serving only 12 months. The Court concludes that early release at this time would create sentencing disparities between Reed and other defendants with similar records convicted of similar crimes, which is what § 3553(a) attempts to prevent. *See* 18 U.S.C. § 3553(a)(6).

*United States v. Reed*, No. CR 15-100, 2020 WL 2850145, at *4 (E.D. La. June 2, 2020).

Accordingly, weighing the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

III.   **If the Court grants release, the government respectfully requests that it include a 14-day quarantine before release.**

Should the Court grant release, the government requests that the Court accommodate the need to quarantine the defendant for a period of at least 14 days to protect public health. The government requests that the Court retain jurisdiction over the motion for 14 days if it makes a determination to grant release, while advising the parties of that decision. BOP will then place the inmate in quarantine. If the defendant has not displayed symptoms or tested positive for COVID-19 for a period of 14 days, the Court may then order release. If the defendant tests positive during the initial 14-day period, the government will notify the Court and seek an extension of the release date until the defendant has displayed no symptoms for a period of 14 days or tested negative.

**<u>CONCLUSION</u>**

For the foregoing reasons, the government respectfully requests that this Court deny the defendant's motion for release based on COVID-19 concerns.

Respectfully submitted,

PETER G. STRASSER
UNITED STATES ATTORNEY

*/s/ David Haller*
DAVID HALLER
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3117

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 9, 2020, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Louisiana, using the electronic case filing system of the court. Because the defendant is represented by counsel, a paper copy of the response was not mailed to the defendant

<u>*/s/ David Haller*                        </u>
DAVID HALLER
Assistant United States Attorney